# EXHIBIT 1

David W. Dow (#007377)
Jennifer L. Ghidotti (#033071)
**DOW LAW OFFICE**
3104 E. Camelback #281
Phoenix, Arizona 85016
Phone: 480.776.5039
Fax: 480.945.0553
Ddowlaw1@gmail.com;
Jlevine@ddowlaw.com
*Attorneys for Plaintiff*

## MARICOPA COUNTY SUPERIOR COURT
## STATE OF ARIZONA

| | |
|---|---|
| LISA GUTIERREZ, | Case No. **CV2021-009877** |
| Plaintiff, | **COMPLAINT** |
| v. | |
| CITY OF PHOENIX, a municipality and jural entity; SEAN PENA, an individual acting under the color of law; JOHN DOES I-V, an individual(s), acting under the color of law, and JANE DOES I-V, an individual(s), acting under the color of law; XYZ CORPORATIONS; ABC LLCs | |
| Defendants. | |

Plaintiff, Lisa Gutierrez, for her Complaint against Defendants alleges as follows:

### PARTIES | JURISDICTION | VENUE

1.      Plaintiff Lisa Gutierrez ("Plaintiff") is an individual and at all relevant times, was a resident of Maricopa County, Arizona.

1

2.     Defendant City of Phoenix ("COP") is and was at all times material hereto a municipal and jural entity and a political subdivision of the State of Arizona; it is located within the geographic bounds of Maricopa County, Arizona.

3.     The Phoenix Police Department ("PPD") is and was at all times relevant hereto a Phoenix agency, providing the vehicle through which the City of Phoenix fulfills its policing functions.

4.     Upon information and belief, Defendant Sean Pena ("Defendant Pena" or "Pena") is and was at all times relevant hereto a citizen of the United States and the State of Arizona, and a resident of Maricopa County, Arizona.

5.     Defendant Pena was at all relevant times employed by PPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under the color of state law and within the scope of his employment.

6.     Upon information and belief, Defendants John or Jane Does are the unnamed, as-yet unidentified individuals, including but not limited to any and all police officers that were present during the incidents/investigations and may be responsible, in part, for the actions/inactions described herein.  Such Jane or John Does know or should have known about at least Defendant Pena's prior sexual assault on his first victim, ("Victim A") and/or other conduct by Defendant Pena and they should have intervened to not allow Defendant Pena to have contact with Plaintiff.

7.     Upon information and belief, Defendants John or Jane Does are also the unnamed, as-yet unidentified individuals who were responsible for investigating the sexual assault of Defendant Pena's first victim ("Victim A").

8.     Upon information and belief, Defendants John or Jane Does are also the unnamed, as-yet unidentified individuals who were responsible for employing,

disciplining, retaining or supervising Defendant Pena with the City of Phoenix, specifically Phoenix Police Department. This includes, but is not limited to those who reviewed Defendant Pena's employment application, employment history, inactions/actions as a police officer, discipline and/or recommendations and/or determinations related to his conduct with Victim A, and were responsible for determining whether Defendant Pena held and continued to hold honesty and integrity as well as the mental, psychological, and/or emotional capabilities required for a position within law enforcement, or were otherwise responsible for the policies and procedures within the City of Phoenix to ensure Applicant's fitness for duty as a City of Phoenix Police Officer.

9. Upon information and belief, Defendants John or Jane Does are also the unnamed, as-yet unidentified individuals whose true names are presently unknown to Plaintiff, but who are or may be liable to Plaintiff for the inactions and actions alleged in Plaintiff's Complaint.

10. Upon information and belief, DOES I-X, ABC Corporations I-X and XYZ LLC's are corporations, partnerships, limited liability companies, individuals or other incorporated or unincorporated associations whose true names are presently unknown to Plaintiff, but who are or may be liable to Plaintiff for the inactions and actions alleged in Plaintiff's Complaint.

11. If and when the true names of such fictitious defendants become known, Plaintiff will seek leave of the Court to amend her Complaint to set forth their true names, capacities and relationships and request that the Amended Complaint relate back to the date this Complaint was filed. Such individuals and/or entities may be responsible for the actions/inactions described herein.

12.     Jurisdiction and venue are proper in Maricopa County, Arizona since Defendants reside and/or caused events to occur in Maricopa County, from which the facts giving rise to this Complaint occurred.

13.     This court has personal and subject matter jurisdiction over the parties and this Complaint.

14.     This case is not subject to Arbitration and should be considered Tier 3 for Discovery and Scheduling Purposes.

15.     Plaintiff demands a jury trial on all issues triable by jury.

## FACTS GENERAL TO ALL COUNTS

16.     Plaintiff hereby incorporates by reference all the proceeding paragraphs as though fully set forth herein.

17.     On or about August 5, 2019, Plaintiff, a Black woman, called the Phoenix Police Department due to an incident with a family friend.

18.     Phoenix police officers arrived at Plaintiff's home, one of which was Defendant Pena.  Officer Antonio Felix #10310 ("Officer Felix") also arrived at Plaintiff's home.

19.     Plaintiff is informed and believes that Defendant Pena is not a Certified Officer as a Crisis Intervention Team Member, and given his prior actions, should never have been sent to a scene where a woman had requested a police response.

20.     Officer Felix was aware that Defendant Pena was previously investigated for the sexual assault of another victim, Victim A.  Despite that knowledge, Officer Felix

4

placed Plaintiff in the backseat of Defendant Pena's patrol vehicle so that Defendant Pena could drive Plaintiff to the home of a suspect for identification purposes.

21.     In fact, Officer Felix was involved in the arrest of Victim A and her transport to SMP. Officer Felix was also at the scene with other police officers when Defendant Pena made contact with Victim B, who is another sexual assault Victim of Defendant Pena.

22.     Officer Felix placed Plaintiff in the backseat of Defendant Pena's patrol vehicle and Defendant Pena drove by the suspect's home while being followed by Officer Felix in his patrol vehicle.

23.     Defendant Pena then brought Plaintiff back to her home.

24.     After Defendant arrived with Plaintiff at Plaintiff's home, Defendant Pena turned off his body-worn camera ("BWC").

25.     After Defendant Pena turned off his BWC and while Plaintiff stood outside Defendant Pena's police vehicle, Defendant Pena told Plaintiff that her then-boyfriend had a misdemeanor warrant.   Defendant Pena told Plaintiff that he could take her then-boyfriend into custody and sexually harassed Plaintiff when he commented that her shirt was see through.

26.     Defendant Pena asked Plaintiff for her phone number and claimed he needed her phone number in case they needed to contact her.

27.     Defendant Pena finally left Plaintiff's residence.

28.     That evening at approximately 11:00 p.m., Plaintiff was walking home from the grocery store when she saw a Phoenix Police vehicle parked almost directly in front of her house.  As she walked past the vehicle, she heard someone yell her name asking her to go to his vehicle.  Plaintiff looked at the vehicle and saw that it was Defendant Pena sitting alone in his police vehicle.

29.	Defendant Pena sexually harassed Plaintiff when he stated she looked nice.

30.	Defendant Pena told Plaintiff to come to the police vehicle where Defendant Pena unlawfully seized Plaintiff and forced her hand on his exposed penis.

31.	Plaintiff yanked her hand away from Defendant Pena's exposed penis, but Defendant Pena forced her hand back on his penis.

32.	Defendant Pena stated to Plaintiff "did you like that" and asked if "this is big enough for you?"

33.	Defendant Pena finally let go of Plaintiff's hand and Plaintiff stepped back away from his patrol vehicle.

34.	Defendant Pena continued to sexually harass and intimidate Plaintiff when Defendant Pena told Plaintiff that he would call her in an hour and that Plaintiff was required to meet him by a field.

35.	In a panic, Plaintiff walked home.

36.	Shortly thereafter, while Plaintiff was inside her home with her daughter and ex-boyfriend, she received a phone call from Defendant Pena telling her to meet him in the field.

37.	Because Defendant Pena was a police officer, Plaintiff felt obligated to go to the field as she feared for the lives and safety of her child, herself and what could happen to her then-boyfriend.

38.	Plaintiff was afraid of Defendant Pena as he had already showed up at her home uninvited and forced sexual contact with Plaintiff.  She was afraid that if she did not comply, she would be killed.

39.	Plaintiff did not feel in control of the situation and was forced to go to the field.

6

40.     Plaintiff walked into the dark field and initially did not see Defendant Pena nor his patrol vehicle in the vacant lot.  While walking through the lot, Plaintiff heard Defendant Pena call Plaintiff's name and Defendant Pena told Plaintiff to walk towards the patrol vehicle.

41.     Plaintiff was in fear for her life and was worried that she was going to be murdered.  Plaintiff worried that she was going to be "just another dead Black woman alone in a field."

42.     Defendant Pena pulled Plaintiff toward him so that Plaintiff was trapped between the driver's side door and the driver's seat.

43.     Defendant Pena demanded oral sex, but Plaintiff begged to not be subjected to oral sex.

44.     Defendant Pena agreed that Plaintiff did not have to give him oral sex, but Defendant Pena forced Plaintiff to masturbate Defendant Pena inside his patrol vehicle where he exposed and fondled her breast.

45.     While Defendant Pena sexually assaulted Plaintiff, he made sexually explicit comments to Plaintiff.

46.     Defendant Pena pulled Plaintiff closer to him using his arm around Plaintiff's shoulders so that Plaintiff's head and body was inside the vehicle above his lap. Defendant Pena pulled Plaintiff's face closer to his penis, which made Plaintiff believe that Defendant Pena attempting to ejaculate on her face.  Defendant Pena ejaculated on Plaintiff's breast and dress.

47.     Humiliated, degraded and scared for her life, Plaintiff was finally allowed to go home.

48.     Defendant Pena told Plaintiff that he would see her later.  Plaintiff feared for her life and walked home.

49.     Defendant Pena never attempted to, nor did he provide medical aid to Plaintiff, including psychological or emotional aid.

50.     Upon information and belief, Defendant Pena continued to stalk Plaintiff after August 5, 2019 when he drove by her home.

51.     Plaintiff courageously reported the sexual assault to Tempe Police Department, who forwarded the report to Phoenix Police Department.

52.     During Phoenix's investigation, Plaintiff identified Defendant Pena in a lineup.

53.     Phoenix Police Department's investigation revealed that on August 5, 2019, Defendant Pena's automatic vehicle location ("AVL") history confirmed that Defendant Pena was: (1) at Plaintiff's address responding to her call for service at 3:13 p.m. and left her home at 3:28 p.m.; (2) at 9:40 p.m., Defendant Pena changed his status to en route to the South Mountain Precinct (400 W. Southern Ave); however, according to AVL records, Defendant Pena took a direct route east on Broadway and went back to Plaintiff's home at 9:58 p.m.; and (3) Defendant Pena went back to South Mountain Precinct until 10:50 p.m. and arrived at the vacant lot (the location of the second sexual assault) at 11:27 p.m.

54.     Defendant Pena's cell phone records confirmed that on August 5, 2019, Defendant Pena called Plaintiff eight (8) times between 10:44 p.m. through 11:05 p.m.

55.     The investigation also revealed that on August 5, 2019, Defendant Pena saved a phone number in his phone under "41G Sgt. Gorden".

56.     Upon information and belief, in November 2019, Defendant Pena was finally placed on Administrative Leave with the City of Phoenix.

8

57.     Upon information and belief, Defendant Pena was belatedly terminated from Defendant COP on July 6, 2020, which was almost two years after Defendant Pena sexually assaulted Victim A and nearly one year after he sexually assaulted Plaintiff.

58.     On or about August 13, 2020, Defendant Pena was indicted in Maricopa County for his sexual assault against Plaintiff and is currently facing criminal charges for Sexual Assault in violation A.R.S. § 13-1406(A) and two counts of Sexual Abuse in violation of A.R.S. § 13-1404(A).

59.     Defendant Pena is currently indicted and facing criminal charges related to three different victims, all of whom were sexually assaulted while Defendant Pena was acting as a Phoenix Police Officer.

**Defendant Pena's Sadistic History of Sexual Violence and Defendant COP's cursory 2018 investigation into Victim A's Sexual Assault.**

60.     Plaintiff hereby incorporates by reference all the proceeding paragraphs as though fully set forth herein.

61.     On or about July 31, 2017, Defendant Pena was hired by Defendant COP as a Phoenix Police Officer, and upon information and belief, in January 2018, Defendant Pena completed police officer training and began acting as a City of Phoenix Police officer.

62.     Defendant Pena was hired during a City of Phoenix police shortage.

63.     On August 26, 2018, a mere eight months after Defendant Pena began his employment with Defendant COP, Defendant Pena sexually assaulted Victim A (sometimes referred to in police reports as "CR") while Defendant Pena was transporting Victim A to Fourth Ave Jail; Victim A was handcuffed in the backseat of his patrol vehicle.

9

64. On August 26, 2018, the night of the sexual assault against Victim A, Defendant COP had a larger shortage of sworn officers on duty than normal and Defendant Pena was required to put in two to three hours of overtime.

65. On August 26, 2018, at approximately 1:30 a.m., Victim A was arrested due to an outstanding warrant and was placed in Defendant Pena's patrol vehicle. Defendant Pena took Victim A to the South Mountain Precinct ("SMP") for processing. Victim A was handcuffed with her hands behind her back during the trip to SMP.

66. Upon information and belief, during the transport to SMP, Defendant Pena did not have his body-worn camera ("BWC") activated or any video in his patrol vehicle.

67. While transporting Victim A to SMP, Defendant Pena asked Victim A "How freaky do you get?"

68. After processing at SMP was completed, at 3:27 a.m., Victim A was placed in Defendant Pena's patrol vehicle to be taken to Fourth Avenue Jail. This time, Victim A was transported to Fourth Avenue Jail with her hands cuffed in front of her. Again, Defendant Pena failed to activate his BWC.

69. It is unknown why Defendant Pena transported Victim A to Fourth Avenue Jail instead of Victim A being transported by a Maricopa County Sheriff's Office ("MCSO") van.

70. Upon information and belief, while transporting Victim A to Fourth Avenue Jail, Defendant Pena again asked Victim A "How freaky do you get?"

71. Upon information and belief, Victim A told Defendant Pena that she could not go to jail because she had a son and stepmother to take care of.

72. During the transport to Fourth Avenue Jail, upon information and belief, Defendant Pena used his position of power as a police officer to coerce Victim A to

unbutton her shirt and expose her breast; Victim A complied and showed Defendant Pena her breast.

73.    While transporting Victim A to Fourth Ave Jail, there was a MCSO prisoner van in front of Defendant Pena's patrol vehicle. Prior to reaching the railroad tracks near Buchanan and 3rd Ave, the MCSO prisoner van made a U-turn before reaching the railroad tracks. Defendant Pena proceeded towards the railroad tracks.

74.    At approximately 3:38:26 a.m., Defendant Pena stopped his patrol vehicle near Buchanan and 3rd Ave near the train tracks as the train was passing.

75.    While stopped at the railroad tracks, Defendant Pena told Victim A to again expose her breasts to him; Victim A complied a second time.

76.    While stopped at the railroad tracks, Defendant Pena exited his patrol vehicle and opened the rear driver's side door. Defendant Pena told Victim A to turn towards Defendant Pena and Defendant Pena exposed his penis through his open pants zipper. Defendant Pena then placed his penis in and out of Victim A's mouth for what Victim A believed to be three minutes.

77.    Defendant Pena then grabbed Victim A's hair and said "Hey, not bad" before pushing her head back into the vehicle. Defendant Pena told Victim A not to say anything.

78.    Victim A then laid down across the rear seat and cried as Defendant Pena drove to Fourth Avenue Jail.

79.    According to Victim A, Defendant Pena did not ejaculate and Defendant Pena did not have pubic hair.

80.    Upon information and belief, surveillance footage confirms that at the time of Victim A's sexual assault, Defendant Pena's patrol vehicle was stopped at the railroad tracks near 3rd Ave and Buchanan, which is merely .2 miles away from Fourth Avenue Jail.

81.     Surveillance footage revealed Defendant Pena's patrol vehicle disappeared for approximately 1 minute and 42 seconds as the vehicle was obstructed by a storage unit until its headlights again appeared as the vehicle turned around.

82.     Records show that Defendant Pena's patrol vehicle was stopped at the railroad tracks from 3:38:26 a.m. to 3:40:08 a.m., which provided Defendant Pena with ample time to sexually assault Victim A.

83.     Thus, Defendant COP obtained surveillance footage that did not refute Victim A's allegations and confirmed that Defendant Pena was stopped at the location where Victim A told Defendant COP she was sexually assaulted.

84.     Victim A was transported to Fourth Avenue Jail; Victim A reported the sexual assault to MCSO Jail Staff.

85.     On August 26, 2018, at 10:45 p.m., Defendant COP performed a buccal swab on Victim A.

86.     On August 27, 2018, at 4:00 p.m., Victim A submitted to a sexual assault examination.

87.     Upon information and belief, Defendant COP did not immediately provide Victim A with an advocate from the Family Advocacy Center.

88.     Finally, five days after the assault, on August 31, 2018, Phoenix Detective Michael Walker ("Det. Walker") interviewed Defendant Pena.

89.     Defendant Pena lied to Det. Walker when he told Det. Walker that when Defendant Pena arrived at the train tracks, Defendant Pena claimed he turned around and followed the MCSO van and that the van was "right in front of me the whole time."

90.     When Defendant Pena was asked if he ever stopped at any point in time where he was alone with Victim A, Defendant Pena stated "I don't think so. Honestly, I don't know." This statement by Defendant Pena was a lie.

91.     When Defendant Pena was advised during the interview that he might be captured on the MCSO van camera if he was right behind the van, Defendant Pena changed his story to state he did not think that he would be on camera because the MCSO van was approximately 100 feet in front of Defendant Pena.

92.     Defendant Pena finally admitted to Defendant COP through the Phoenix Police Department's Det. Walker, that the MCSO van turned around first and Defendant Pena stopped at the railroad tracks for a period of time before he turned around.

93.     During Defendant Pena's April 10, 2020 Professional Standards Bureau ("PSB") Interview, Defendant Pena estimated that he was stopped at the railroad tracks for approximately three (3) minutes.

94.     Defendant Pena originally lied during his interview with Det. Walker when he stated that he was behind the MCSO van the entire time and stated that he was unsure whether he ever stopped during Victim A's transport. It was not until Defendant Pena was told that there might be video footage from the MCSO van that Defendant Pena changed the narrative and claimed he was stopped and had to turn around.

95.     Defendant Pena's inconsistent statements concerning the pivotal facts surrounding the actions, time and location of the sexual assault should have alerted Det. Walker and any other investigators that Defendant Pena was guilty. Every police officer is aware of the significance of a lie and an inconsistent statement made by a suspect, especially if the lie is directly related to circumstances surrounding the actions in question.

96.     Det. Walker and any other investigators were, or should have been, aware that a truthful individual does not need to lie and can consistently use their memory to give their statement, whereas someone who is not being truthful can often misremember their lie and/or need to embellish or omit facts to cover up their lie.

97.     At the conclusion of the interview, Defendant Pena was asked whether he would submit to a buccal swab for DNA comparison, but he declined.

98.     On August 31, 2018, Det. Walker finally authored an Affidavit in Support of Order for Obtaining Identifying Evidence. The Honorable Tracy Nadzieja of the Maricopa County Superior Court issued the Order for Obtaining Evidence, which specifically ordered the procurement of a Buccal Swab from Defendant Pena.

99.     That same day, August 31, 2018, Det. Walker obtained two sets of buccal swabs from Defendant Pena.

100.    Shockingly, Det. Walker's report was devoid of all of the crucial information that highlighted Defendant Pena's inconsistent statements concerning whether he stopped at any point while transporting Victim A and whether he followed behind the MCSO van the entire time.

101.    Additionally, while Detective Walker's Report did state "I obtained buccal swabs from Pena" it conveniently omitted and failed to mention that Defendant Pena declined to voluntarily submit to a buccal swab and that his DNA was obtained only after a search warrant.

102.    Det. Walker's failure to provide an objective report is consistent with the Blue Code of Silence as more thoroughly described herein and underscores the importance of a third-party investigating an officer-involved offense.

103.    Despite the fact that Defendant Pena forced Victim A to perform oral sex on him through the zipper of his pants, and thus, Victim A's saliva would have very likely been found on Defendant Pena's pants and zipper, Defendant COP never sought a search warrant to search Defendant Pena's clothing. Especially when dealing with DNA evidence, quick collection is extremely important to maintain the integrity of the sample and to avoid deterioration/destruction of evidence.

104.    Despite the fact that Victim A told investigators that Defendant Pena did not have pubic hair, upon information and belief, during the initial investigation, Defendant COP failed to ask Defendant Pena whether he had pubic hair or obtain a search warrant to search his pubic area.

105.    Instead, the search warrant only sought Defendant Pena's DNA, even though Defendant COP knew that Defendant Pena did not ejaculate and that analysis of buccal swabs without ejaculate is unreliable.

106.    On August 31, 2018, rather than conduct a confrontation call, a City of Phoenix Detective initiated a confrontation text.

107.    Upon information and belief, Defendant COP's confrontation text message deviates from the normal procedure of initiating a phone call.  It is exceedingly unlikely that someone guilty of a crime, especially a police officer who just sexually assaulted a victim, would admit to anything in writing.

108.    Defendant COP ultimately determined that there was "insufficient evidence" and closed the investigation. Phoenix SID closed the investigation on Defendant Pena without even initiating an administrative, Internal Investigation, or Professional Standards Bureau Investigation.

109.    Defendant COP also failed to report this incident to Maricopa County Attorney's Office for possible charges or to AZPOST (Arizona Peace Officer Standards and Training Board) for possible decertification of Defendant Pena.

110.    Defendant COP closed the investigation without reporting it to any additional departments or entities, despite the fact that: (1) Defendant COP could not confirm that Defendant Pena did not sexually assault Victim A; (2) Defendant Pena was stopped at the railroad tracks at the time Victim A reported the assault and Defendant Pena lied about being behind the MCSO van at all times in an attempt to cover up the sexual assault at the railroad track; and (3) Defendant Pena failed to voluntarily submit to a DNA test.

111.    Defendant COP did nothing more than a cursory and wholly inadequate investigation into Victim A's allegations and did not discipline, terminate, suspend or even increase supervision on Defendant Pena.

112.    Upon information and belief, during the 2018 investigation into Victim A's allegations, Defendant COP never subjected Defendant Pena to a polygraph nor did it even ask Defendant Pena to submit to a polygraph.

113.    Additionally, upon information and belief, Defendant Pena's clothing was not tested for DNA.

114.    During the 2018 Investigation, Defendant COP was told by Victim A that Defendant Pena did not have pubic hair, yet upon information and belief, Defendant COP failed to look at or inquire into whether Defendant Pena shaved his genital area and take any photographs thereof.

115.    Defendant COP, through its failures and inactions, helped Defendant Pena destroy crucial evidence. Defendant COP should have promptly investigated the deplorable allegations as soon as they were reported on August 26, 2018.  Instead, Defendant Pena

was free to go home where he could shower to remove all trace of Victim A's DNA from his penis and could discard and/or clean his clothes to remove Victim A's DNA from his pants and zipper.

116.    Upon information and belief, Defendant COP failed to question Defendant Pena as to why he transported Victim A and why he transported her without activating his BWC or any inside vehicle camera.

117.    Plaintiff is informed and believes that the investigators into this assault were Phoenix Police Officers and not an outside, unbiased third-party agency.

**Defendant Pena's Sexual Assault Against Victim B.**

118.    On November 20, 2019, Victim B (sometimes referred to in police reports as "KL") reported to Defendant COP that Defendant Pena sexually assaulted her on June 1, 2019.

119.    According to Victim B, while she sat in the back of Defendant COP's patrol vehicle, Defendant Pena sexually harassed Victim B. Defendant Pena drove Victim B to a vacant lot located on 11th Ave and West Lynne Lane, removed Victim B's handcuffs, and told Victim B to get into the front seat of his City of Phoenix police vehicle.

120.    Defendant Pena used his position as a Police Officer to force sexual conduct with Victim B. Defendant Pena, without consent, grabbed and fondled Victim B's breasts.

121.    Defendant Pena forced Victim B to grab his penis, Defendant Pena told Victim B to masturbate his penis and then forced Victim B's head towards his penis, where Defendant Pena demanded Victim B conduct oral sex. Fearing for her life, Victim B complied.

122. Defendant Pena made harassing and intimidating comments to Victim B, including but not limited to telling her that they would do this again and ordering her to meet him at the same spot the following day.

123. Victim B reported Defendant Pena to Phoenix police.

124. Finally, PSB investigators were put on notice and investigated Defendant Pena.

**Defects in the 2018 Internal Investigation and the 2019 PSB Investigation.**

125. Plaintiff was, at minimum, the third victim of Defendant Pena and a proper prior investigation would have prevented her assault.

126. Upon information and belief, Defendant COP failed to conduct a polygraph on Defendant Pena after Victim A's assault. Considering Defendant Pena's bias, motive, and inconsistent statements during the 2018 cursory investigation into Victim A's assault, a polygraph on Defendant Pena was warranted and essential.

127. In fact, after Victim B came forward with allegations against Defendant Pena, Defendant COP finally asked Officer Pena to voluntarily participate in a polygraph; Defendant Pena declined.

128. Both Victim A and Victim B reported Defendant Pena did not have pubic hair, yet during Victim A's 2018 investigation, Defendant COP never inquired into whether Defendant Pena had pubic hair.

129. Upon information and belief, it was not until the 2019 PSB Investigation, which was after Plaintiff's sexual assault, that Defendant Pena was asked about his "grooming standards in his genital area." Defendant Pena stated it was common for Defendant Pena to shave off his pubic hair with a razor consistent with both Victims descriptions.

18

130.    Further, it was not until the 2019 PSB Investigation that Defendant COP conducted research to determine whether there were any additional victims.  Defendant COP finally researched any females being transported by Defendant Pena from March 2019 – November 2019 when Defendant Pena was riding as a single man unit or when BWC was not activated

131.    Upon information and belief, Defendant Pena, began his employment with Defendant COP as a police officer in January 2018, not March 2019.

132.    Defendant COP could have and should have investigated whether Defendant Pena had prior victims after Victim A reported Defendant Pena, but Defendant COP chose not to conduct such an investigation.

133.    Defendant COP's research "criteria" (when Defendant Pena was patrolling alone or did not have his BWC activated) also underscores Defendant COP's failure to properly supervise Defendant Pena.  Defendant COP knew that this criterion could create an environment in which Defendant Pena could act as a sexual predator and commit violent sexual acts, yet failed to enhance Defendant Pena's supervision after Victim A reported the sexual assault.

134.    In fact, during the first year of the body worn cameras being implemented in a California city in 2012, "…the number of complaints filed against officers fell by 88 percent compared with the previous 12 months [and] …[u]se of force by officers fell by almost 60 percent over the same period."

135.    Defendant COP knew that requiring that the BWC be activated at all times would act as a deterrent against sexual misconduct and sexual assault, yet Defendant COP failed to require Defendant Pena to keep his BWC activated at all times and his car video activated at all times, if equipped with one.

136. On July 23, 2020, AZPOST opened its investigation into Defendant Pena, which suggests Defendant COP failed to report Defendant Pena to AZPOST until sometime in Summer 2020.

## **Defendant City of Phoenix**

137. Plaintiff incorporates all of the proceeding paragraphs as though fully incorporated herein.

138. Upon information and belief, despite Phoenix's size and rate of population growth, its police department continues to face a shortage of officers on the streets.

139. Upon information and belief, with less officers patrolling and resources spread thin, Phoenix Law Enforcement Association describes the morale within the Phoenix Police Department as low; the officers feel unsupported from the city and that their collective voice is going unheard.

140. Upon information and belief, the Phoenix Police Department has over 300 fewer officers compared to ten years ago and remaining officers are working overtime. This reduction is especially acute considering Phoenix's rapid population growth in the last ten years. Thus, the structural deficiencies in the City were exacerbated by growing number of less experienced officers and shortages.

141. At all relevant times, Jeri Williams ("Williams") was the Chief of Police for the City of Phoenix Police Department ("PPD") with the ultimate authority to control and supervise and is responsible for the actions of its officers and agents. PPD, through Williams, has the authority and responsibility to establish policies, practices, customs, procedures, protocols and training for the PPD.

142. According to Williams, she believes that in 2020 PPD implemented "substantial changes" that she believes "improves our ability to meet community

expectations to serve, protect, and reduce crime in Phoenix while treating community members with dignity and respect."

143. Plaintiff was certainly not treated by Defendant Pena nor Defendant COP "with dignity [or] respect."

144. Defendant COP's failure to promote an atmosphere conducive to hiring female police officers is an aggravating factor in the number of sexual assault and/or harassment claims against Defendant COP and its officers.

145. The Blue Code of Silence can involve inadequate investigation, failure to cooperate and and/or outright lies. Plaintiff is informed and believes that any investigation into Victim A's allegations should have had nonpolice investigators and outside agencies investigate these heinous offenses by a Phoenix police officer instead of Phoenix Police Department with a clear bias and conflict of interest.

146. Defendant COP has a pattern and practice of tolerating misconduct within its department, which underscores the importance of non-Phoenix police officers investigating its own officers and the importance of civilian review boards investigating police officers.

147. By way of example, in 2017 officer Christopher Turiano shot a Donald Trump protester, Joshua Cobin, in the groin and it was later revealed that a team of officers had created a "challenge coin" memorializing and celebrating the shot. The coin states "MAKING AMERICA GREAT AGAIN, ONE NUT AT A TIME" and "GOOD NIGHT LEFT NUT" with an image of Cobin and the date of the protest. Despite knowledge of these actions, PPD Chief Williams never reported these incidents; the coin was not discovered by the public until several years later.

148. In 2021, it was discovered that Phoenix police officers made false statements under oath to a grand jury regarding protestors. The Court found a COP Sergeant colluded

with a Maricopa County Prosecutor to present testimony to the Grand Jury that was "clearly false, misleading, and inflammatory." COP responded that "Phoenix police officers commit to the highest levels of integrity and honesty. The community deserves nothing less. When they fall short of that expectation, appropriate action will be taken."

149. When Defendant Pena miserably failed to have the "highest levels of integrity and honesty" and was caught lying to Detective Walker regarding pivotal facts related to Victim A's sexual assault, Phoenix took no actions, appropriate or otherwise against Defendant Pena. Instead of conducting a thorough investigation by having Defendant Pena take a lie detector test, reporting the incident to the Internal Standards Bureau, AZ Post, Maricopa County Prosecutors, or having a non-Phoenix Police Department investigate, COP chose to do nothing, which allowed and emboldened a sexual predator with a gun and a badge to prey on other Phoenix citizens, including Plaintiff.

150. The Blue Code of Silence is a policy and practice of Defendant COP that interferes with the Constitutional rights of victims of police sexual misconduct. This Code practice leads to the police officers groundlessly supporting and backing up one another creating an "us against them" mentality.

151. The Blue Code of Silence is indicative of police officer's willingness to not only continue with the Code of Silence, but to wrongfully protect fellow officers, such as Defendant Pena.

152. Defendant COP through PPD knows that according to AZPOST the largest percentage of officers in Arizona lose their AZPOST Certification ("Certification") as police officers because of untruthfulness; yet investigators failed to require Defendant Pena to submit to a polygraph after Victim A's sexual assault.

153. Defendant COP knows or should have known that according to AZPOST the second most common reason for police officer's loss of Certification involves sexual misconduct by police officers while on duty, yet they failed to adequately investigate Victim A's sexual assault.

154. Defendant COP knows or should have known that police officers have lost Certification due to police officers' failure to investigate cases.

155. Defendant COP failed to: (1) ensure officer truthfulness; (2) recognize sexual misconduct is rampant and a common reason for loss of AZPOST Certification; and (3) ensure that an adequate and unbiased investigation into the incident involving Victim A was conducted.

156. Upon information and belief, Defendant COP failed to adequately ask questions, adequately investigate potential evidence which led to the destruction of pivotal evidence, and otherwise failed to adequately investigate Victim A's allegations and advocate for the community and its victims.

157. Furthermore, upon information and belief, Defendant COP conducted the investigation into its own police officer, Defendant Pena, ignored the conflicting and convoluting evidence, and neglected and effectively lost potentially incriminating evidence.

158. Defendant COP failed to report Defendant Pena to Maricopa County Attorneys' Office for investigation or possible *Brady* list inclusion, to the AZPOST or even refer Victim A's assault to its own Professional Standards Bureau. This is a major structural failure within Defendant COP's investigative system, which provides for internal biases favoring its own officers.

159.    Defendant COP knew or should have known that Defendant Pena was prone to dishonesty, which is a violation of Defendant COP policies and should have been reported to the *Brady* list.

160.    In fact, upon information and belief, on April 7, 2021, the City of Phoenix City Council approved a Memorandum of Understanding ("MOU") between the City and Phoenix Law Enforcement Association ("PLEA") wherein Defendant COP adopted a change that explicitly allows for non-police city of Phoenix investigators, such as civilian oversight committee to investigate officers.

161.    The complete disregard of Victim A and lackadaisical nature of the investigation emboldened Defendant Pena to commit additional acts of sexual violence as it allowed a sexual predator to continue patrolling the streets of Phoenix alone in a single man unit with authority, a weapon and no supervision.

162.    Despite the fact that Defendant COP either knew or should have known that Defendant Pena sexually assaulted Victim A, Defendant Pena maintained his employment with Defendant COP.

163.    Defendant COP had both active and constructive notice that its failure to supervise and terminate Pena would result in additional acts of sexual violence, yet it did nothing to prevent additional acts of sexual violence from occurring, through its failure to enhance supervision and oversight over Defendant Pena, terminate Defendant Pena or otherwise discipline and aggressively monitor Defendant Pena.

164.    Notwithstanding the fact that Defendant COP failed to adequately investigate Victim A's allegations, Defendant COP's faulty investigation did not refute any of the allegations made by Victim A, but instead confirmed the location of the sexual assault and otherwise supported Victim A's sexual assault.

24

165.    Defendant COP's cursory investigation did not reveal that Defendant Pena was innocent and that he did not assault Victim A. Nevertheless, Defendant COP did not enhance Defendant Pena's supervision or attempt to determine whether Defendant Pena committed the deplorable acts upon Victim A so to ensure Defendant Pena could not harm other innocent victims.

166.    Even if Defendant COP could not confirm or refute Victim A's allegations (due to the biased and improper nature of the underlying investigation), Defendant COP should have acted to ensure the public was safe by making sure the conduct did not occur, such as requiring Defendant Pena to keep on his body worn camera at all times, requiring Pena to patrol with a partner, requiring Defendant Pena to patrol in a two-man unit, initiating a real confrontation call or otherwise enhancing Defendant Pena's supervision or continue investigating the allegations as more thoroughly described herein. Instead, Defendant COP failed to increase Defendant Pena's supervision, discontinued investigating the allegations and did nothing to make sure the conduct did not occur and would not occur to future victims.

167.    When confronted with officer safety issues after the George Floyd protests, Phoenix adopted a two patrolmen per car policy. When confronted with female citizen's safety from Defendant Pena, Phoenix failed to adopt a two patrol per car policy for Defendant Pena.

168.    Due to Defendant COP's failures, on June 1, 2019, Defendant Pena sexually assaulted Victim B.

169.    Due to Defendant COP's failures on August 5, 2019, Defendant Pena sexually assaulted Plaintiff.

25

**<u>The City of Phoenix and Phoenix Police Department's</u>**
**<u>Notice of Prior Instances of Sexual Misconduct.</u>**

170.    Plaintiff hereby incorporates by reference all the proceeding paragraphs as though fully set forth herein.

171.    Upon information and belief, sexual misconduct by police officers is a significant problem within this Country, which Defendant COP either knows or should already know, and Defendant COP must ensure that its policies and procedures are sufficient to prevent its officers from committing sexually related offenses to protect the general public.

172.    In fact, upon information and belief, on April 7, 2021 the City of Phoenix City Council adopted the MOU (Memorandum of Understanding) between the Defendant COP and PLEA (Police Law Enforcement Association) and changed its policy to remove language warning a citizen about possible criminal charges if they file a false complaint about a police officer.

173.    Defendant COP's belated change was made as prior language had the effect of potentially discouraging residents from alerting Defendant COP about police officer misconduct, and thus, chilled the speech of victim's reporting sexual misconduct under the First Amendment and in violation of Due Process under the Fourteenth Amendment.

174.    Policy prior to April 7, 2021 discouraged true reporting of police officer sexual offenses, and thus, Plaintiff will never know how many instances of sexual violence were committed by Phoenix Police Officers (including Defendant Pena) because of this policy that Defendant COP finally recognized as intimidation that emboldened its officers to commit sexual offenses.

175. While knowing that most victims of sexual assault do not report sexual assaults, let alone by police officers as more thoroughly described herein, prior to April 7, 2021, Defendant COP through PPD substantially suppressed reports of sexual misconduct against its officers. This Three Wise Monkeys Policy ("hear no evil, speak no evil, see no evil"), provided a means for Defendant COP to claim that it did not know of its police officer's sexual misconduct.

176. According to the CATO Institute's National Police Misconduct Reporting Project's 2010 Annual Report, officer-involved sexual misconduct was the second most common form of misconduct reported throughout 2010 and police officers were more than two-times more likely to commit sexual assaults than the general population.

177. Upon information and belief, Black women are the victims of thirty-five percent (35%) of police officer sexual assaults, although Black women constitute significantly less than thirty-five percent (35%) of the general population.

178. Upon information and belief, Black women make up approximately three-and one-half percent (3 ½ %) of Phoenix population.

179. Upon information and belief, some criminals are attracted to what they perceive as "high voltage" occupations. Serving as police officers provides a cover to do as they choose, misusing their positions of authority. Without proper oversight, they become overly confident and eventually indulge their antisocial inclinations.

180. In fact, a 2015 investigation by the Associated Press found that roughly 1,000 officers lost their badges in a six-year period for rape, sodomy and other sexual assault, sex crimes that included possession of child pornography, or sexual misconduct such as propositioning citizens or having consensual but prohibited on-duty intercourse.

27

181.    Defendant COP cannot close its eyes to the reality that its police department employs individuals who are statistically more likely to commit sexual assaults than the general public.

182.    Phoenix must implement adequate policies and policies in order to protect its citizens, whether through education, training, oversight, body cameras, retention, harsh discipline and other means.

183.    Upon information and belief, a study financed by the United States Department of Justice found a way to ensure accountability regarding sexual assaults committed by police personnel is to include within the department's sexual assault policy "specific policies and procedures [that] should outline the police response to sexual assault in the event that it involves individuals employed by the police agency."[1]

184.    Through Defendant COP's failure to implement adequate policies and procedures to prevent sexual offenses from occurring, Defendant COP has failed to hold its officers accountable and protect victims.

185.    Upon information and belief, Defendant COP is often unwilling to go against police officer associations and oppose the messages stated in press releases and otherwise oppose agenda from these police officer associations.

186.    The Blue Code of Silence is a policy and practice of Defendant COP that interferes with the Constitutional rights of victims of police sexual misconduct. This Code practice leads to the police officers groundlessly supporting and backing up one another creating an "us against them" mentality.

---

[1] https://www.policeforum.org/assets/SexualAssaultResponseExecutiveGuidebook.pdf at p. 73 (last visited 04/08/2021)

28

187. Upon information and belief, challenging this Code can lead to being shunned, losing friends, losing backup, receiving threats or having their own misconduct exposed. This Code does not punish bad police officers, only good police officers.

188. Defendant COP has failed to implement measures to combat the Code, which includes but is not limited to Defendant COP's failure to use polygraphs; physiological evaluation; harsh punishments for violations, including the failure to report; and basic and repeated annual training on ethical duties.

189. Defendant COP has been subjected to prior lawsuits based on its police officers committing acts of sexual misconduct and Defendant COP has settled lawsuits related thereto.

190. The City Council received notice of each lawsuit filed against the City.

191. All substantial monetary settlements made by the City must be approved by the City Council.

192. In 2019, Defendant COP had Notice of a lawsuit against Phoenix Police Officer Marcos Rodriguez and Defendant COP based on Rodriguez's sexual misconduct. In that case, Defendant Rodriguez alerted Plaintiff to pull the vehicle over where Defendant invited Plaintiff to coffee. Defendant then showed up at Plaintiff's home, talked about how his marriage was without passion, sexually harassed Plaintiff by making lude and sexual comments to Plaintiff, including but not limited to comments about anal sex and talking about digitally penetrating Plaintiff's anus during sex, failed to leave Plaintiff's home despite many requests to leave and pointed a gun on Plaintiff. The parties agreed to a settlement. *See* 2:19-cv-03095, Arizona District Court.

193. In 2016, Defendant COP had Notice of a lawsuit against Phoenix Police officer Timothy T. Morris and Defendant COP based on Morris' sexual misconduct. Upon

information and belief, Morris forced his victim to perform oral sex while she was handcuffed. The parties agreed to a settlement. *See* CV2016-090855, Maricopa County Superior Court.

194. Moreover, upon information and belief, between 1999-2018, Defendant COP has settled 204 claims related to Phoenix Police Departments' excessive force and various related claims. Defendant COP has agreed to settle the 204 claims for $35,521,401.05.

195. According to publicly available information found at https://policecrime.bgsu.edu/Home/Map, between 2005-2015 the City of Phoenix employed as police officers eight (8) police officers who were arrested for sexual related offenses. This does not include officers who were disciplined for sexual related offenses, but not charged criminally. **See Exhibit A**.

196. In 2012, Defendant COP had notice of sexual assault occurring within PPD when Former Phoenix police officer Christopher Wilson was sentenced to twenty-three years in prison and a lifetime of probation for engaging in sex crimes with minors he met through PPD. He pled guilty to two counts of sexual misconduct with a minor and one count of attempting to commit sexual misconduct with a minor. The victims were a 17-year-old and 14-year-old boy. *See* CR2012-142112-001

197. In 2015, Defendant COP had notice of sexual misconduct occurring within PPD when former Phoenix police officer Justin LaClere pled guilty of both luring a minor for sexual exploitation and then having sexual intercourse with her. *See* CR2014-103013-001

198. Upon information and belief, in 2017 Defendant COP had notice of sexual misconduct within its department when the Professional Standards Bureau was contacted by Gretchen Matteson regarding her ex-husband Officer Robert Sitek ("Sitek") because he

was stalking and harassing her. The issue was transferred to SID and FIB. Although SID was unable to establish probable cause regarding the stalking/harassment claim, they found three separate violations of the Arizona Criminal Justice System that were traced to Sitek's Terminal Operator Certification (TOC). During the investigation, Sitek admitted that he had accessed personal information of three individuals for personal reasons. Sitek also admitted that he was aware his actions violated Phoenix Police Department policy and Arizona law, he pled guilty and only received 30 days of non-supervised probation. Sitek is on the *Brady* list.

199. Upon information and belief, in 2011 Defendant COP had notice of sexual misconduct within its department when it discovered its Officer Sheldon Czegledi, while vacationing in El Paso in 2011, Texas, approached an undercover female deputy and after speaking with her, made an agreement to pay forty-five dollars for sexual intercourse. He was arrested by El Paso County Sheriff's department and booked into jail. Czegledi is on the *Brady* list.

200. Upon information and belief, in 2011 Defendant COP had notice of sexual misconduct within PPD when Officer Larry White conducted a criminal history records check on a woman that he was romantically involved with, Ms. Adams. When the romantic relationship ended, Officer White attempted to get Ms. Adams' personal information through her friend, Ms. Lukaszewski. Officer White used a PACE search to ascertain Ms. Lukaszewski's exact address. Officer White then showed up to her home, under the false pretense of a call for service regarding a burglary, Officer White searched her backyard while on-duty. After searching her backyard, Officer White entered the home of Ms. Lukaszewski and had an emotional conversation regarding his recent breakup. While the

first search with the system remained unresolved, the other two accusations have been sustained. White is on the *Brady* list.

201. Upon information and belief, in 2007 and 2010, Defendant COP had notice of instances of sexual misconduct by its officers when an internal investigation revealed Phoenix Police Officer Jeff Gordon was giving and getting oral sex and engaging in other sexual acts on several occasions in 2007 and 2010, while on duty. Remarkably, he received merely a four-day suspension after an internal affairs investigation. There are other allegations that while on duty, Gordon had nonconsensual sexual contact with a city employee when he slipped his hands under the blouse of the employee and actually touched her breasts as he was giving her a massage and also sent her two pornographic video texts. Upon information and belief, "Gordon told investigators that he and the female employee were talking about how stressed out she was, and he started giving her a massage. He admitted that his hands moved from her neck and shoulders to her 'upper chest' around her 'clavicles' because 'he believes it feels good when done to him and would serve as a good de-stressor.'"[1]

202. Upon information and belief, Defendant COP had notice of sexual misconduct within its department when in 2009, Investigators from the Professional Standards Bureau ("PSB") were made aware of misconduct by Officer Michael Fernandez. Ms. Arlica Hernandez informed PSB that she had met officer Fernandez on November 5 while he was on duty and engaged in sexual activity with him. Ms. Hernandez says that she met him at a gas station where he asked to see her breasts. With two of her friends present, she removed her shirt and showed her breasts to Officer Fernandez. Officer

[1] https://www.phoenixnewtimes.com/news/timeline-of-the-phoenix-polices-worst-misconduct-scandals-11309123

Fernandez proceeded to touch them and used his cell phone to take a picture. Ms. Hernandez says that they exchanged phone numbers at this time and that Officer Fernandez picked her up from a friend's house later that night, in a fully marked patrol vehicle. Officer Fernandez drove Ms. Hernandez who was in the back seat of the vehicle to an isolated location where they engaged in kissing and Officer Fernandez once again touched Ms. Hernandez's breasts. The next day, November 6, the two met again while Officer Fernandez was both in uniform and on-duty. They engaged in similar sexual conduct and Ms. Hernandez informed Officer Fernandez that she was "buzzed." When she was leaving, Officer Fernandez allowed her to drive away without stopping her.

203. Officer Fernandez admitted to kissing and touching Ms. Hernandez's breasts on November 5, but denied taking a picture on his cell phone. He also admitted that Ms. Hernandez had informed him that she was drunk on November 6 but claims that he conducted a Horizontal Gaze Nystagmus test, which he had never received any training on, to determine that she was not too inebriated to drive. Moreover, during the investigation of this misconduct, it was revealed that Officer Fernandez had used Mobile Data Computer to look up the personal information of Ms. Hernandez, their mutual friend Angela Moya and Ms. Hernandez's mother, Ophelia Valesquez. While engaging in this misconduct, he found that Ms. Moya had a warrant out for her arrest. Despite knowing that, Officer Fernandez failed to arrest Ms. Moya and admitted to accessing the information for personal gain. Fernandez is on the *Brady* list.

204. Upon information and belief, in 2006 Defendant COP had notice of misconduct within its department when Officer Jarrett McNeil stopped a vehicle that was swerving within its lane of traffic and flirted with the driver of the vehicle, including commenting on her breast size. The driver provided Officer McNeil with her personal

33

phone number and Officer McNeil released the driver without taking any enforcement action. After the stop, Officer McNeil arrived unannounced at the home of the driver and continued flirting, offering to take her on a ride in his patrol vehicle. She agreed and he put her in the backseat. Officer McNeil drove a short distance to a shadowed area and engaged in sexual activity while in the back seat, including fondling breasts and brushing her vaginal area. Officer McNeil denies having any contact with the vaginal area.

205. The next day the woman contacted a different Phoenix Police Officer regarding Officer McNeil's interaction with her. That Officer advised Officer McNeil to contact his supervisor. Officer McNeil proceeded to drive to the woman's residence and question why she reported him. Afterwards, Officer McNeil contacted his supervisor and advised of the traffic stop, purposefully omitting any sexual contact. The PSB interviewed the woman who stated that she felt verbally coerced into the sexual contact. Officer McNeil admitted that he flirted with the driver, that he went to her house after the traffic stop, that he took her to a vacant lot, and that he fondled her breasts. Officer McNeil claims that the interaction was consensual. He also admitted that he intentionally omitted information when reporting to his supervisor. Officer McNeil was only suspended for 16 days. McNeil is on the *Brady* list.

206. Upon information and belief, Phoenix police officers have also faced additional internal complaints for sexual misconduct, lawsuits related to sexual misconduct and other criminal charges have been filed related to sexual misconduct.

**Defendant COP has failed to implement or enforce adequate policies and procedures.**

34

207.    Plaintiff hereby incorporates by reference all the proceeding paragraphs as though fully set forth herein.

208.    Defendant COP, through Williams and PPD, has either failed to properly hire, supervise, discipline, monitor and train its employees and/or failed to establish policies and procedures that would prevent individuals that were not fit for duty from being hired, employed, employed without supervision and retained as a police officer, within the City of Phoenix Police Department.

209.    As such, Defendant COP's alleged policies and procedures led to Plaintiff's injuries as Defendant COP's alleged policies or customs reflect a deliberate indifference to the constitutional rights of its inhabitants, including Plaintiff, as Defendant COP has historically and systemically failed to ensure that its officers are mentally, emotionally, and/or psychologically fit for duty.

210.    Upon information and belief, Defendant Pena was hired by Defendant COP as a Phoenix Police officer in January 2018.

211.    Upon information and belief, on August 26, 2018, merely eight months after Defendant Pena was hired by Defendant COP as a Phoenix Police Officer, Victim A reported to Phoenix Police that she was sexually assaulted by Defendant Pena.

212.    Victim B was sexually assaulted by Defendant Pena in June 2019.

213.    Plaintiff was sexually assaulted by Defendant Pena on August 5, 2019.

214.    Thus, prior to Plaintiff's sexual assault, not only was Defendant COP aware that it needed adequate policies and procedures to prevent sexual misconduct by its officers, but it also specifically knew or should have known of Defendant Pena's deplorable acts of sexual violence upon Victim A, yet failed to properly investigate the sexual assault, discipline, supervise, monitor, and remove Defendant Pena from his position of power as

35

a Phoenix Police Officer. Instead, Defendant Pena continued to patrol the streets of Phoenix alone in a one-man unit free to use his badge, gun, city issued patrol vehicle and police power to commit additional sexual assaults upon the women of Phoenix.

215.    Plaintiff is informed and believes that Defendant COP knew or should have known that the investigation it performed into Defendant Pena's sexual assault against Victim A was woefully inadequate and should have had a nonpolice and non-Phoenix police investigator(s) thoroughly examine Defendant Pena's actions and inactions.

216.    Defendant Pena should have been given a lie detector test by an impartial agency and additional investigatory measures should have occurred, especially considering Defendant COP could never refute Victim A's allegations, Pena's inconsistent statements, his failure to voluntarily provide a DNA sample and other reasons more thoroughly described herein.

217.    Despite Defendant COP's knowledge of Victim A's assault, Defendant COP failed to discipline Defendant Pena who was retained by Defendant COP after Victim A's sexual assault, which caused Plaintiff's assault.

218.    Despite Defendant COP's knowledge of at least Victim A's sexual assault, Defendant COP failed to properly supervise and monitor Defendant Pena as he patrolled the streets of Phoenix alone in a one-man unit. Considering the gross allegations, Defendant COP should have had, at minimum, enforced substantially enhanced supervision, monitoring and oversight.  Instead, Defendant COP through PPD allowed Defendant Pena to roam free as a predator in a single man unit interfacing with the general public and pedestrians.

219.    Defendant COP has: (1) failed to recruit officers who will not commit constitutional violations on its citizens; (2) failed to train its employees to properly

36

administer employment examinations to determine whether Applicants applying for employment within Phoenix Police Department are fit for duty and failed to train in its officers on how to properly investigate an officer-involved allegation of sexual misconduct; and/or (3) failed to implement adequate hiring and retention policies and procedures to prevent perverse and heinous individuals like Defendant Pena from employment and retention within Defendant COP.

220. Defendant COP failed to properly train and/or supervise its officers who failed to properly investigate Defendant Pena's first sexual assault of Victim A, including but not limited to failing to adequately ask questions, failing to subject Defendant Pena to a lie detector test, failing to ensure the preservation of evidence, document and reporting the evidence, or otherwise failing to adequately investigate Victim A's sexual assault as more thoroughly described herein.

221. Defendant COP failed to implement proper policies and procedures to ensure that a fair and unbiased investigation into a Phoenix police officer was conducted. Defendant COP investigated Victim A's allegations rather than engaging another non-City of Phoenix police agency and/or a nonpolice investigator to conduct the investigation despite the clear conflict of interest.

222. Defendant COP has failed to train and/or supervise its employees regarding investigating officer-involved allegations of sexual misconduct as Defendant COP's failure to adequately investigate Victim A's allegations caused Defendant Pena to remain employed by Defendant COP as a police officer in a single unit, which caused Plaintiff's sexual assault.

223. Defendant COP's failure to adequately investigate Victim A's allegations, and its failure to discipline and supervise Defendant Pena empowered Defendant Pena to

37

commit additional acts of sexual violence. Thus, Defendant COP had a policy or custom of failing to properly supervise, investigate and discipline officers who had committed prior instances of sexual assault.

224. Defendant COP's policy and practice of the Blue Code of Silence enabled Defendant Pena to commit acts of sexual violence, including the sexual assault against Plaintiff.

225. The Blue Code of Silence derives in part from a culture of machismo.

226. PPD has historically had a low percentage of sworn female police officers and even as of today, only has fourteen percent (14%) sworn female officers, even though women make up slightly more than fifty percent (50%) of Phoenix's population.

227. Plaintiff is informed and believes that the "Cop Culture" discouraged the recruitment, hiring and retention of women.

228. Defendant COP failed to provide appropriate leadership, training and oversight. Defendant City of Phoenix's failure to supervise patrol officers' and adequately investigate claims of sexual assault and harassment by its officers has occurred at every level, from front line supervisors (sergeant), investigation and review, to chain of command's secondary review of investigation, to final review by command staff and Chief of Police. Supervisors must take a more proactive role in demanding improved internal and outside reporting, more careful on scene investigations and more thorough secondary review.

229. Defendant COP's failure to supervise officers and investigate claims of sexual assault by its officers occurred at every level, from front line supervisors (sergeant), investigation and review, to chain of commands secondary review of investigation, to final review by command staff.

230.    Defendant COP's failure to have appropriate policies to eliminate the Blue Code of Silence created a policy and practice that led to, and emboldened, a sexual predator, like Defendant Pena, to prey on the citizens of Phoenix.

231.    Despite written requests, Defendant COP has failed to provide full reports regarding Defendant Pena's sexual assaults and COP's investigation related to Defendant Pena's three known victims and delayed producing the partial reports. This failure to produce full reports and the delaying actions is consistent with the Blue Code of Silence and contrary to the purported new policy of "transparency."

232.    Defendant COP has failed to develop adequate policies and training relating to sexual assault and harassment by its officers.

233.    Upon information and belief, Defendant COP does not have an adequate sexual misconduct policy, and thus, Defendant COP has failed to implement adequate policies to deter officers from committing sexually motivated offenses.

234.    Upon information and belief, Defendant COP does not have training regarding sexual misconduct nor does it have heightened discipline for sexual misconduct to be reinforced during training and retention.

235.    Defendant COP has failed to develop adequate policies and training relating to sexual assault and harassment by its officers, which includes but is not limited to holding supervisors accountable for actions of their subordinates.  When policy does not clearly delineate supervisor responsibilities, supervisors frequently neglect it and upon information and belief there is no watch commander referred for further review.

236.    Defendant COP does not have appropriate further review when investigating its own officers. Defendant City of Phoenix lacks a disciplined remedial structure and

Defendant City of Phoenix does not appropriately hold first line supervisors accountable for inadequate investigation or review of sexual assault and harassment.

237. Upon information and belief, Defendant COP does not have first line review of sexual assault and harassment by officers.

238. Upon information and belief, Defendant COP does not have polices to support unbiased, outside or civilian review of sexual assault and harassment by officers.

239. Proper leadership, training, monitoring, oversight and outside agency referral were ignored by Defendant COP.

240. Upon information and belief, there is: (1) inadequate first line review of sexual assault and harassment by officers; (2) insufficient on scene investigations; (3) no requirement that supervisors thoroughly investigate all allegations of sexual assault and harassment and refer such incidents to appropriate authorities; (4) inadequate policies to support unbiased review of complaints against officers.

## DAMAGES

241. Plaintiff hereby incorporates by reference all paragraphs as though fully set forth herein.

242. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer severe emotional distress, for which she has sought mental health treatment and counseling.

243. As a result of Defendants' conduct, Plaintiff's emotional trauma includes, but is not limited to: suicidal thoughts; horrific memories, flashbacks and nightmares about the traumatizing events; difficulties working and interacting with friends and family; sexual issues; a feeling of anger, helplessness, guilt and loneliness; fear of diseases that could significantly impact her health and life; fear of retaliation from Defendant COP or other

40

individual officers; it has also caused Plaintiff to have difficulties trusting other people, especially those with authority, and has impacted her relationship with her fiancé.

244.    As a direct result of Defendants' conduct, Plaintiff's relationship with her family has been negatively affected.

245.    As a result of Defendants' conduct, Plaintiff has incurred medical expenses, diminution in earning capacity, emotional, psychological and mental damages, lost wages, future and past medical treatment and has developed a fear of the police.

## COUNT I

**Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Violation of Fourteenth Amendment Substantive Due Process) –** *By Plaintiff against Defendant Pena individually and in his official capacity.*

246.    Plaintiff hereby incorporates by reference all paragraphs as though fully set forth herein.

247.    As a citizen of the United States, Plaintiff is entitled to the protection and benefit of the laws and Constitution of the United States of America.

248.    The Fourteenth Amendment of the United States Constitution declares "nor shall any State deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. Amend. 14.

249.    At all relevant times, Defendant Pena was a state actor whose conduct is subject to 42 U.S.C. § 1983 and the 14th Amendment of the United States Constitution.

250.    Plaintiff has a liberty interest in her life, body integrity, and liberty.

251.    The circumstances of Defendant Pena's encounter with Plaintiff shock the conscience and constitute a deprivation of Plaintiff's liberty interest in violation of the due

41

process clause of the Fourteenth Amendment and was excessive and unreasonable force in violation of the Fourth Amendment.

252. Defendant Pena used actual unlawful force, harassment and coercion to achieve his goals.

253. Defendant Pena was deliberately indifferent to Plaintiff's life, safety, health and body integrity when without Plaintiff's consent Defendant Pena forced Plaintiff to touch his penis on two different occasions, fondled Plaintiff's breasts and forced Plaintiff to engage in masturbatory penile conduct. This caused Plaintiff actual harm and substantially increased Plaintiff's risk of harm.

254. Defendant Pena was also deliberately indifferent to Plaintiff's life, safety, health and integrity when he stalked, sexually harassed, called and intimidated Plaintiff and insinuated that she or her family would be targeted if she did not comply with Defendant Pena's demands.

255. Defendant Pena was afforded time to deliberate over whether his sexual misconduct, verbal coercion, harassment and threats were in violation of Plaintiff's liberty interest and despite this opportunity, Defendant Pena committed deplorable and sadistic acts against Plaintiff, including fondling Plaintiff's breasts, forcing Plaintiff to engage in masturbatory penile conduct; and, making lude and harassing comments to Plaintiff both while she was unlawfully seized and when she was not seized as more thoroughly described herein.

256. Defendant Pena acted with a purpose to harm unrelated to any legitimate law enforcement objective.

257. As a direct and proximate result of Defendant Pena's actions, Plaintiff suffered severe personal injuries as more thoroughly described herein.

42

258.    Plaintiff's substantive due process rights were violated and she sustained damages as fully set forth herein.

## COUNT II
### Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Excessive Force) – *By Plaintiff against Defendant Pena individually and in his official capacity.*

259.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

260.    The acts and conduct of Defendant Pena constituted an illegal and unconstitutional use of force under the Fourth and Fourteenth Amendments.

261.    At all material times, Defendant Pena was acting under the color of state law, as an agent of City of Phoenix, and within the course and scope of his employment and authority as a duly certified law enforcement officer of the City of Phoenix.

262.    Every reasonable officer would have known that using physical force to place Plaintiff's hand on Defendant Pena's exposed penis constitutes excessive and unreasonable force in violation of the Fourth Amendment.

263.    Every reasonable officer would have known that stalking, coercion, intimidation, fear and other types of verbal force and physical force to force sexual contact with Plaintiff as more thoroughly described herein constitutes excessive and unreasonable force.

264.    Defendant Pena's conduct as more thoroughly described herein was objectively unreasonable and violated clearly established law.

265.    The excessive and unreasonable force occurred both while Plaintiff was unlawfully seized and when she was not seized as more thoroughly described herein.

266.    As a direct and proximate result of the excessive and unreasonable force, Plaintiff sustained the damages more fully described herein.

### COUNT III
**Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Unlawful seizure)**
***–Plaintiff against Defendant Pena individually and in his official capacity.***

267.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

268.    The Fourth and Fourteenth Amendments protect the right of the people to be secure in their persons against unreasonable seizures.

269.    At all material times, Defendant Pena was acting under the color of state law, as an agent of City of Phoenix, and within the course and scope of his employment and authority as a duly certified law enforcement officer of the City of Phoenix.

270.    Defendant Pena unlawfully restrained Plaintiff's freedom of movement such that she was not free to leave.

271.    The acts committed by Defendant Pena constituted an unreasonable seizure as there was no probable cause to believe Plaintiff committed a crime.

272.    Using his position as a law enforcement officer, Defendant Pena unlawfully seized Plaintiff on at least two separate occasions as more thoroughly described herein. Plaintiff was initially seized when Defendant Pena assaulted and battered Plaintiff when he grabbed Plaintiff's hand and forced contact with his exposed penis as more thoroughly described herein.

273.    Plaintiff was also seized when Defendant Pena forced Plaintiff to leave her home and to go to the vacant lot, pulled Plaintiff toward Defendant Pena so that Plaintiff was trapped between the driver's side door and the driver's seat where Defendant Pena

44

demanded oral sex, but agreed to masturbation while he exposed himself and fondled Plaintiff's breast until he ejaculated on Plaintiff's breast and dress.

274. At all relevant times, Plaintiff was in fear for her life and the life of her daughter and felt that she was not free to leave without Defendant Pena's permission.

275. As a direct and proximate result of the unlawful seizure, Plaintiff sustained the damages more fully described herein.

## COUNT IV
*Monell* **Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Excessive Force, Sexual Misconduct and Sexual Harassment) Unconstitutional Policy and Custom; Failure to Supervise & Discipline; Failure to Train; Negligent Hiring; Negligent Retention** *Plaintiff against Defendant City of Phoenix.*

276. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

277. Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP was aware or should have known of an internal problem within the Department of employing, failing to supervise and retaining individuals as Phoenix police officers who commit sexual related offenses against its citizenry as more thoroughly described herein.

278. Prior to the August 5, 2019 sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that recently AZPOST found that officer-involved sexual misconduct was the second most common form of misconduct reported throughout 2010.

279.     Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that police officers were more than two-times more likely to commit sexual assaults than the general population.

280.     Prior to the August 5, 2019, sexual misconduct/sexual assault upon Plaintiff, Defendant COP either knew or should have known it has employed officers who have been criminally charged for sexual misconduct.

281.     Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that it has settled claims with victims of Phoenix police officers related to instances of sexual assault, sexual harassment, and other types of sexual misconduct.

282.     Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that it must have adequate training, supervision and policies and procedures to ensure that Phoenix Police officers who are accused of sexually related offenses are adequately investigated.

283.     Defendant COP knew, or should have known, that it could not sit blindly by while its officers sexually violate its citizens' rights, and it must take a proactive approach to combat sexual misconduct by its officers.  Instead, upon information and belief, before the sexual assault upon Plaintiff, Defendant COP did virtually nothing to prevent sexual assault, sexual harassment and other types of sexual misconduct by the hands of its officers.

284.     Prior to the August 5, 2019, sexual misconduct/sexual assault on Plaintiff, and as early as August 26, 2018, Defendant COP knew or should have known Defendant Pena sexually assaulted Victim A.

285.     As such, prior to the August 5, 2019, sexual assault, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not

46

have adequate policies and procedures to hire, monitor, train, retain/terminate and supervise its officers that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful seizure and excessive force at the hands of law enforcement officers.

286.    As such, prior to the August 5, 2019, sexual assault against Plaintiff, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not have adequate policies and procedures to ensure that its officers were mentally, emotionally, and ethically fit for duty, and to implement policies and procedures to make sure its Officers would not commit the deplorable acts described herein, that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful seizure and excessive force at the hands of law enforcement officers.

287.    As such, prior to the August 5, 2019, sexual assault, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not have adequate policies and procedures to investigate police officer misconduct, including sexual misconduct, that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful  seizure and excessive force at the hands of law enforcement officers.

288.    As such, prior to the August 5, 2019, sexual assault, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not have adequate policies and procedures to terminate and/or supervise police officers who have committed sexual misconduct that such would result in the deprivation of United

47

States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful seizure and excessive force at the hands of law enforcement officers.

289. PPD's final policymakers, including its Chief of Police, and therefore also Defendant COP, deliberately and consciously adopted unconstitutional policies and procedures of: (1) failing to adequately screen and vet potential Phoenix Police Department candidates, whether by its failure to have adequate policies or procedures and/or failing to train those employees tasked with Phoenix Police Officer's employment as more thoroughly described herein; (2) failing to adequately investigate allegations of sexual misconduct, whether by its failure to have adequate policies or procedures and/or failing to train those employees tasked with investigating allegations of sexual misconduct of a newly hired police officer as more thoroughly described herein; (3) failing to adequately supervise Defendant Pena, especially after Defendant COP was on notice of a prior sexual assault, and instead allowed Defendant Pena to patrol the streets in a one man unit as more thoroughly described herein and/or failing to have adequate policies and procures regarding actions to take if Defendant COP cannot refute allegations of sexual assault; (4) failing to discipline and terminate Defendant Pena from his employment with Defendant COP as more thoroughly described herein and/or inadequate policies and procedures related to officer termination and supervision; (5) attempting to and suppressing victims of PPD officer crimes by Defendant COP's policy of intimidation through threatening criminal prosecution of victims for false reporting; and (6) failing to eliminate/substantially reduce the Blue Code of Silence that provides for an environment that values law-breaking officers over the citizens they are sworn to protect.

**(A) COP's failure to implement policies and procedures to ensure officer's fitness for duty through failing to hire competent police officers.**

290. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

291. Defendant COP through PPD has failed to implement policies and procedures to ensure only those with the moral and ethical character required to act as a police officers are hired, which amounts to a policy or custom of failing to hire only those who will not violate the constitutional rights of its citizenry as more thoroughly described herein.

292. Defendant COP through PPD has also failed to train its officers on how to adequately screen potential law enforcement Applicants prior to hiring Applicants and during their employment to ensure officer fitness for duty, including but not limited to psychological, mental and emotional fitness as more thoroughly described herein.

293. Defendant COP is also liable for its failure to train. Defendant COP failed to train its employees on how to properly administer employment applications to determine hiring eligibility and fitness for duty.

294. The deprivation of Plaintiff's constitutional rights would have been avoided if Defendant COP did not hire or retain Defendant Pena in its employ, which would have occurred had Defendant COP properly trained its officers to vet, screen and investigate individuals prior to, and during their employment with City of Phoenix and properly trained its officers on how to adequately investigate officer related allegations of sexual assault and their subsequent retention, and referred serious allegations of Phoenix Police Department employee misconduct allegations to non-Phoenix Police Department agencies for investigation.

295.    The deprivation of Plaintiff's constitutional rights would have been avoided if Defendant COP had adequate policies and procedures to ensure only those officers who are fit for duty are employed as police officers, whether through requirements and/or qualifications.

**(B) Defendant COP's failure to implement adequate policies and procedures related to investigating Phoenix police officer's misconduct and/or failure to train its officers how to investigate Phoenix police officer's sexual misconduct.**

296.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

297.    Defendant COP through PPD has failed to implement policies and procedures to adequately investigate allegations of sexual misconduct by its Police officers, such as implementing the use of a third-party, non-biased agency or non-police officer investigation and/or has failed to train its officers how to investigate sexual misconduct by its police officers as more thoroughly described herein, which amounted to a deliberate indifference to the Constitutional rights of Plaintiff.

298.    Part of Defendant COP's unconstitutional policy and custom has resulted in, and part of, the Code of Blue Silence.  Defendant COP either knew or should have known a nonpolice investigation was warranted to facilitate nonbiased policing, or even, at a bare minimum, a non-Phoenix Police Department should have investigated serious crimes involving its officers.

299.    Detective Walker's inadequate investigation and his omission of details from his report underscores the Code of Blue Silence and the bias and deference afforded to Phoenix police officers over its citizens.

50

300.    Defendant COP has a pattern and practice of tolerating misconduct within its department, which underscores the importance of non-Phoenix police officers investigating its own officers.

301.    By way of example, in 2017 officer Christopher Turiano shot a Donald Trump protester, Joshua Cobin, in the groin and it was later revealed that a team of officers had created a "challenge coin" memorializing and celebrating the shot. The coin states "MAKING AMERICA GREAT AGAIN, ONE NUT AT A TIME" and "GOOD NIGHT LEFT NUT" with an image of Cobin and the date of the protest. Despite Williams having known about the coin, she did not immediately reveal it or act to discipline anyone.

302.    In 2021, it was discovered that Phoenix police officers made false statements under oath to a grand jury regarding protestors which resulted in the dismissal of many of the charges.

303.    Recently, it was uncovered that City of Phoenix police officers had fabricated a "gang" to classify protestors as gang members. The gang was entered into statewide database called GangNet as "ACAB" and 17 protestors were arrested for criminal street gang charges. By allowing officers to charge people with exaggerated offenses because of their own biases, Defendant COP does not have the best interests of the citizens of Phoenix and is failing to supervise its offers on several different levels.[1]

304.    It has recently been brought to light that Phoenix officers purposefully embellished case facts when an officer claimed that a protester stabbed him with the sharpened tip of an umbrella. Evidence, photos and a video from the incident in question show that the protestor never stabbed at the officer and the umbrella did not have a

[1] https://www.abc15.com/news/local-news/investigations/protest-arrests/prime-for-abuse-lack-of-oversight-lets-phoenix-police-add-protesters-to-gang-database

sharpened tip. This incident highlights the institutionalized acceptance, tolerance and encouragement of lying within the Defendant COP.[1] In fact, the Maricopa County Attorney, Allister Adel, is concerned about the truthfulness and credibility of these COP officers and possible inclusion on the *Brady* list.

305.    On May 19, 2021, COP finally created a civilian police oversight office to independently investigate incidents through the Office of Accountability and Transparency (OAT). According to Defendant COP, the Office "…will independently investigate allegations and create greater transparency for the Phoenix Police Department." Defendant COP claims that "…there is still much work to be done to dismantle the systemic inequities." A program like this, if enacted earlier, could have saved Plaintiff from being sexually assaulted, humiliated, and irreparably damaged.

306.    The Blue Code of Silence is indicative of police officer's willingness to not only continue with the Blue Code of Silence, but to wrongfully protect fellow officers, such as Defendant Pena, which is evidenced by Det. Walker's biased and cursory investigation.

307.    Det. Walker's report was devoid of all of the crucial information that highlighted Defendant Pena's inconsistent statements concerning whether he stopped at any point while transporting Victim A and whether he followed behind the MCSO van the entire time, and that Defendant Pena refused the buccal swab.

308.    When Det. Walker ascertained that Pena had lied about turning around the police car and immediately following the MCSO van, Det. Walker should have required that Pena immediately take a lie detector test or otherwise investigate. Det. Walker never even asked Pena to take a lie detector test, and thus, perpetuated the Blue Code of Silence.

---

[1] https://www.abc15.com/news/local-news/investigations/protest-arrests/phoenix-police-department-falsely-claimed-protester-stabbed-officer-with-sharpened-umbrella

309. Defendant COP, through its inadequate investigation in Victim, A failed to do at least the following: (1) properly interrogate Defendant Pena through thoroughly asking questions; (2) promptly investigating and obtaining crucial evidence concerning Victim A's assault (i.e. promptly obtaining a search warrant to search Defendant Pena's clothing and person; (3) subjecting Defendant Pena to a lie detector test; (4) researching and communicating with other potential victims; (5) interviewing potential witnesses (i.e. driver of the MCSO van); (6) refer the sexual assault to PSB, a third party police agency, a non-police civilian review committee; and (7) other failures more thoroughly discussed herein.

310. Rather, Defendant COP through its failure to train, supervise or failure to enact proper policies and procedures regarding police officer investigations gave Defendant Pena preferential treatment and a favorable bias merely because he was a police officer.

311. PPD's final policymakers, including its Chief of Police, and therefore also Defendant COP, deliberately and consciously adopted unconstitutional policies that emboldened Defendant Pena to commit additional acts of sexual violence. Through Defendant COP's failure to properly investigate Victim A's allegations and Defendant COP's failure to enhance Defendant Pena's supervision after he was accused of a serious sexual offense, Defendant COP enabled and emboldened Defendant Pena to commit additional acts of sexual violence.

312. By way of example, during the claimed investigation into Victim A's sexual assault, Defendant COP failed to use or request polygraph testing on Defendant Pena despite Defendant Pena lying about following the MCSO van at all times and despite his refusal to provide a DNA sample. Additionally, upon information and belief, Defendant

53

COP: (1) failed to search Defendant Pena's penis area, clothing or vehicle for DNA; (2) failed to adequately ask questions, including but not limited to failing to determine why Defendant Pena did not have his BWC activated, why he lied about following the MCSO van at all times, etc.; (3) failed to conduct a Confrontation Call and instead conducted a Confrontation Text when any reasonable officer knows that a police officer would never admit to anything in writing, especially if he committed a sexual assault; (4) failed to have an outside agency investigate the allegations; (5) failed to submit Victim A's investigation to AZPOST, or MCAO's office prior to Victim B and Plaintiff's sexual assault and failed to conduct an administrative and internal investigation into Victim A's assault; (6) delayed five days before speaking with, and searching, Defendant Pena; (7) omitted crucial facts within the investigatory report; and, (8) committed other failures within the investigation as more thoroughly described herein.

313. Upon information and belief, Defendant COP does not have an adequate sexual misconduct policy, and thus, Defendant COP has failed to implement adequate policies to deter officers from committing sexually motivated offenses.

314. Defendant COP through PPD has failed to train or failed to supervise its employees to ensure proper conduct between its officers and citizens and has failed to implement mandatory training in regard to proper procedures for detention and interactions with citizens as more thoroughly described herein, including but not limited to the use of BWC and video/audio in the patrol car while transporting citizens.

315. Defendant COP has failed to develop adequate policies and training relating to sexual assault and harassment by its officers, which includes but is not limited to holding supervisors accountable for actions of their subordinates. Upon information and belief, there is: (1) inadequate first line review of sexual assault and harassment by officers; (2)

54

insufficient on scene investigations; (3) no requirement that supervisors thoroughly investigate all allegations of sexual assault and harassment or appropriate further review when investigating its own officers; (4) no disciplined remedial structure; and (5) Defendant COP does not appropriately hold first line supervisors accountable for inadequate investigation or review of sexual assault and harassment as more thoroughly described herein.

316. Defendant COP failed to provide appropriate leadership, training, and oversight. Defendant City of Phoenix's failure to supervise patrol officers and adequately investigate claims of sexual assault and harassment by its officers has occurred at every level, from front line supervisors (sergeant), investigation and review, to chain of command's secondary review of investigation, to final review by command staff. Supervisors must take a more active role in demanding improved reporting, more careful on scene investigations and more thorough secondary review.

**(C) Defendant COP failed to supervise and terminate Defendant Pena from his position as a Phoenix Police Officer, which enabled and emboldened Defendant Pena to commit additional acts of sexual violence.**

317. Plaintiff incorporates by reference all proceeding paragraphs as though fully set forth herein.

318. Defendant COP has developed, enacted, and tolerated policies and procedures that led to its failure to discipline, supervise and terminate officers who are accused of sexual misconduct, which amounts to a policy, practice, or custom of failing to employ and retain only those who will not violate the constitutional rights of its citizenry.

319. Defendant COP through PPD has failed to implement policies and procedures to adequately terminate and otherwise discipline and remove from a position of

power in law enforcement those officers who sexually assault citizens, such as Defendant Pena, and failed to implement and enforce policies and procedures so that officers like Defendant Pena are not retained as more thoroughly described herein.

320. Even after Victim A reported the sexual misconduct, not only was Defendant Pena retained, but Defendant COP failed to even enhance his supervision and oversight.

321. Despite Defendant COP's apparent intention to clear Defendant Pena (rather than conduct an objective investigation), Defendant COP could not confirm that Defendant Pena did not commit the assault against Victim A.

322. Despite Defendant Pena's lies, omissions, coverups and his failure to voluntarily submit to a buccal swab, compounded by Victim A's consistent statements that could not be disproven, Defendant Pena continued to patrol the streets in a single man unit with absolutely no additional supervision such as the requirement to have his BWC and vehicle camera activated at all times, patrol with another police officer, etc.

323. Despite the heinous allegations that could not be disproven, Defendant Pena roamed free to sexually violate other victims without reproach.

324. Through Defendant COP's failure to properly investigate Victim A's allegations as more thoroughly described herein, Defendant COP's failure to enhance Defendant Pena's supervision after he was accused of a serious and heinous sexual offense as more thoroughly described herein, and Defendant COP's failure to terminate Defendant Pena as more thoroughly described herein, Defendant COP emboldened Defendant Pena to commit additional acts of sexual violence.

325. Thus, Defendant COP through its actions and inactions, has tolerated, encouraged, ratified, and acted with a deliberate indifference to the policies, or patterns,

practices, and customs, as well as its deliberate indifference to the need for more or differently improved policies and procedures.

326. PPD final policymakers, including Chief Williams, and therefore also Defendant COP, made deliberate and conscious decisions to create inadequate policies and procedures, if any at all. Defendant City of Phoenix was recklessly and/or deliberately indifferent to the rights of individuals like Plaintiff.

327. PPD's final policymakers, including its Chief of Police, and therefore also Defendant COP, deliberately and consciously adopted unconstitutional policies of retaining police officers who have committed sexual assaults or who were otherwise engaged in sexual misconduct, which it knew would lead to the deprivation of liberty interest and rights of individuals, including Plaintiff's rights.

328. Notwithstanding Defendant COP's knowledge, PPD final policymakers, including its Chief of Police, and therefore also Defendant City of Phoenix, deliberately and consciously adopted unconstitutional policies and/or encouraged, tolerated, or ratified unconstitutional widespread PPD practices and customs.

329. The policies or customs/practices of Defendant City of Phoenix directly and proximately caused the violation of Plaintiff's constitutional rights and other damages as more fully set forth herein.

330. The Defendant City of Phoenix directly and proximately caused the violation of Plaintiff's constitutional rights and other damages as more fully set forth herein, with its encouragement, toleration, ratification, and deliberate indifference to the policies, or patterns, practices, and customs, as well as its deliberate indifference to the need for more or different employment screening, training, monitoring, supervision, investigation or discipline.

**(D) Defendant COP implemented unconstitutional policies and procedures that curtailed and suppressed victims of PPD's officer crimes to report misconduct through its policy of intimidation.**

331.   Plaintiff hereby incorporates by reference the proceeding paragraphs as though fully set forth herein.

332.   As more thoroughly stated herein, on April 7, 2021, the City of Phoenix City Council approved a MOU between the Defendant COP and PLEA wherein Defendant COP adopted a change that explicitly allows for non-police city of Phoenix investigators, such as a civilian oversight committee to investigate officers.

333.   The MOU between the Defendant COP and PLEA also belatedly changed COP and PPD's policy to remove language warning citizens about possible criminal charges if they file a false complaint about a police officer as the language had the effect of potentially discouraging and chilling residents from alerting Defendant COP about police officer misconduct.

334.   This was an unconstitutional policy that discouraged true reporting of police officer sexual offenses, and thus, Plaintiff will never know how exactly many instances of sexual violence were committed by Phoenix Police Officers.  This former policy interfered with due process rights and chilled the First Amendment rights of the victims of police misconduct.

335.   This policy, that Defendant COP finally recognized on April 7, 2021 as intimidation that emboldened its officers to commit sexual offenses, has led to officers walking the streets with the means to harm innocent civilians while knowing that they will very likely not be caught or punished, like Defendant Pena.

336.     Considering most victims of sexual assault do not report sexual assaults, let alone sexual assaults by police officers as more thoroughly described herein, Defendant COP through PPD substantially suppressed reports of sexual misconduct against its officers. This Policy provided a means for Defendant COP to claim that it did not know of its police officer's sexual misconduct and provided a means which empowered and enabled Defendant Pena to sexually assault his victims, like Plaintiff, without fear of recourse.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff requests the following against all Defendants:

A.     Judgment in favor of Plaintiff in an amount to be proven at trial, including compensatory damages; expenses for past and future medical expenses; emotional damages; loss of enjoyment of life; loss of wages; and diminution in earning capacity;

B.     Pre and post judgment interest at the highest permissible rate;

C.     Punitive damages as allowed by law against Individual Defendants in an amount to be determined at trial;

C.     Incurred costs;

D.     An award of attorney fees pursuant to U.S.C. § 1988(b);

D.     Trial by jury as to all issues so triable; and

E.     For such relief to which Plaintiff is entitled and is just and proper.


DATED this 18th day of June, 2021.

**DOW LAW OFFICE**

By:     ***/s/ David W. Dow***
         David W. Dow

Jennifer L. Ghidotti
**DOW LAW OFFICE**
3104 E. Camelback #281
Phoenix, Arizona 85016
*Attorneys for Plaintiff*

# Exhibit A

# Arrested Officer Information:

**Arrested Officer:**
05254N04451
**Age:**
50
**Years of Service:**
26
**Sex:**
M
**Arrested Officer Ethnicity:**
Non-Hispanic
**Arrested Officer Race:**
Non-Black
**Rank:**
Detective

# Arrested Officer's Employer:

**Employing Agency:**
Phoenix Police Department
**Agency ID:**
13934890
**City:**
Phoenix
**County:**
Maricopa County
**State:**
AZ
**Type of Agency:**
Municipal Police Department

# Case Information:

**Date of Arrest:**
4/30/2008
**Most Serious Offense Charged:**
Pornography / obscene material
**Type of Crime:**
Sex-Related
**Officer's Duty Status During Crime:**
Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is not officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer was suspended for a period of time
Officer resigned from employment
**Criminal Case Disposition:**
Officer was convicted of crime
**Pre Trial Release:**
Officer was released pending trial or disposition
**Conviction Level:**
Officer was convicted of a felony
**Conviction Type:**
Officer was convicted by a guilty plea
**Most Serious Sentence:**
Officer was sentenced to prison
**Incarceration Length:**
90 months
**Appellate Review:**
Conviction was not appealed

# Victim Information:

**Victim Sex:**
Unknown
**Victim Age:**
Unknown
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
No
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is an unrelated child
**Victim Injury:**
Unknown

# Arrested Officer Information:

**Arrested Officer:**
03387N02848

**Age:**
47

**Years of Service:**
14

**Sex:**
M

**Arrested Officer Ethnicity:**
Non-Hispanic

**Arrested Officer Race:**
Non-Black

**Rank:**
Officer/Deputy/Trooper

# Arrested Officer's Employer:

**Employing Agency:**
Phoenix Police Department

**Agency ID:**
13934890

**City:**
Phoenix

**County:**
Maricopa County

**State:**
AZ

**Type of Agency:**
Municipal Police Department

# Case Information:

**Date of Arrest:**
8/26/2011

**Most Serious Offense Charged:**
Prostitution

**Type of Crime:**
Sex-Related

**Officer's Duty Status During Crime:**
Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer was suspended for a period of time
**Criminal Case Disposition:**
Unknown
**Pre Trial Release:**
Officer was released pending trial or disposition

# Victim Information:

**Victim Sex:**
F
**Victim Age:**
Unknown
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
Yes
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is a stranger
**Victim Injury:**
Unknown

# Arrested Officer Information:

**Arrested Officer:**
07094N06035
**Age:**
43
**Years of Service:**
13
**Sex:**
M
**Arrested Officer Ethnicity:**
Non-Hispanic
**Arrested Officer Race:**
Non-Black
**Rank:**
Detective

# Arrested Officer's Employer:

**Employing Agency:**
Phoenix Police Department
**Agency ID:**
13934890
**City:**
Phoenix
**County:**
Maricopa County
**State:**
AZ
**Type of Agency:**
Municipal Police Department

# Case Information:

**Date of Arrest:**
8/7/2012
**Most Serious Offense Charged:**
Statutory rape
**Type of Crime:**
Sex-Related Violence-Related
**Officer's Duty Status During Crime:**
Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is not officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer resigned from employment
**Criminal Case Disposition:**
Officer was convicted of crime
**Pre Trial Release:**
Officer was held in custody pending trial or disposition
**Conviction Level:**
Officer was convicted of a felony
**Conviction Type:**
Officer was convicted by a guilty plea
**Most Serious Sentence:**
Officer was sentenced to prison
**Incarceration Length:**
276 months
**Appellate Review:**
Conviction was not appealed

# Victim Information:

**Victim Sex:**
M
**Victim Age:**
14
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
No
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is an unrelated child
**Victim Injury:**
Serious Physical Injuries

# Arrested Officer Information:

**Arrested Officer:**
07095N06035
**Age:**
43
**Years of Service:**
13
**Sex:**
M
**Arrested Officer Ethnicity:**
Non-Hispanic
**Arrested Officer Race:**
Non-Black
**Rank:**
Detective

# Arrested Officer's Employer:

**Employing Agency:**
Phoenix Police Department
**Agency ID:**
13934890
**City:**
Phoenix
**County:**
Maricopa County
**State:**
AZ
**Type of Agency:**
Municipal Police Department

# Case Information:

**Date of Arrest:**
8/7/2012
**Most Serious Offense Charged:**
Statutory rape
**Type of Crime:**
Sex-Related Violence-Related
**Officer's Duty Status During Crime:**
Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is not officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer resigned from employment
**Criminal Case Disposition:**
Officer was convicted of crime
**Pre Trial Release:**
Officer was held in custody pending trial or disposition
**Conviction Level:**
Officer was convicted of a felony
**Conviction Type:**
Officer was convicted by a guilty plea
**Most Serious Sentence:**
Officer was sentenced to prison
**Incarceration Length:**
276 months
**Appellate Review:**
Conviction was not appealed

# Victim Information:

**Victim Sex:**
M
**Victim Age:**
17
**Victim Ethnicity:**
Non-Hispanic
**Victim Race:**
Non-Black
**Victim is Sex Worker:**
No
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is an unrelated child
**Victim Injury:**
Serious Physical Injuries

# Arrested Officer Information:

**Arrested Officer:**
09134N07513
**Age:**
32
**Years of Service:**
7
**Sex:**
M
**Arrested Officer Ethnicity:**
Non-Hispanic
**Arrested Officer Race:**
Non-Black
**Rank:**
Officer/Deputy/Trooper

# Arrested Officer's Employer:

**Employing Agency:**
Phoenix Police Department
**Agency ID:**
13934890
**City:**
Phoenix
**County:**
Maricopa County
**State:**
AZ
**Type of Agency:**
Municipal Police Department

# Case Information:

**Date of Arrest:**
1/17/2014
**Most Serious Offense Charged:**
Statutory rape
**Type of Crime:**
Sex-Related
**Officer's Duty Status During Crime:**
Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer resigned from employment
**Criminal Case Disposition:**
Officer was convicted of crime
**Pre Trial Release:**
Officer was held in custody pending trial or disposition
**Conviction Level:**
Officer was convicted of a felony
**Conviction Type:**
Officer was convicted by a guilty plea
**Most Serious Sentence:**
Officer was sentenced to jail
**Incarceration Length:**
2 months
**Appellate Review:**
Conviction was not appealed

# Victim Information:

**Victim Sex:**
F
**Victim Age:**
17
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
No
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is an unrelated child
**Victim Injury:**
Serious Physical Injuries

# Arrested Officer Information:

**Arrested Officer:**

09604N07923

**Age:**

51

**Years of Service:**

25

**Sex:**

M

**Arrested Officer Ethnicity:**

Unknown

**Arrested Officer Race:**

Unknown

**Rank:**

Lieutenant

# Arrested Officer's Employer:

**Employing Agency:**

Phoenix Police Department

**Agency ID:**

13934890

**City:**

Phoenix

**County:**

Maricopa County

**State:**

AZ

**Type of Agency:**

Municipal Police Department

# Case Information:

**Date of Arrest:**

6/19/2014

**Most Serious Offense Charged:**

Assisting or promoting prostitution

**Type of Crime:**

Sex-Related Violence-Related

**Officer's Duty Status During Crime:**

Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer resigned from employment
**Criminal Case Disposition:**
Unknown
**Pre Trial Release:**
Officer was released pending trial or disposition

# Victim Information:

**Victim Sex:**
F
**Victim Age:**
Unknown
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
Yes
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is a stranger
**Victim Injury:**
No Physical Injuries

# Arrested Officer Information:

**Arrested Officer:**
09903N08180
**Age:**
61
**Years of Service:**
37
**Sex:**
M
**Arrested Officer Ethnicity:**
Hispanic
**Arrested Officer Race:**
Non-Black
**Rank:**
Sergeant

# Arrested Officer's Employer:

**Employing Agency:**
Phoenix Police Department
**Agency ID:**
13934890
**City:**
Phoenix
**County:**
Maricopa County
**State:**
AZ
**Type of Agency:**
Municipal Police Department

# Case Information:

**Date of Arrest:**
8/29/2014
**Most Serious Offense Charged:**
Other sex crime
**Type of Crime:**
Sex-Related
**Officer's Duty Status During Crime:**
Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer resigned from employment
**Criminal Case Disposition:**
Officer was convicted of crime
**Pre Trial Release:**
Officer was released pending trial or disposition
**Conviction Level:**
Officer was convicted of a felony
**Conviction Type:**
Officer was convicted by a jury trial
**Most Serious Sentence:**
Officer was sentenced to prison
**Incarceration Length:**
120 months
**Appellate Review:**
Conviction was not appealed

# Victim Information:

**Victim Sex:**
Unknown
**Victim Age:**
Unknown
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
No
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is an unrelated child
**Victim Injury:**
Unknown

# Arrested Officer Information:

**Arrested Officer:**
10915N09046
**Age:**
40
**Years of Service:**
7
**Sex:**
M
**Arrested Officer Ethnicity:**
Non-Hispanic
**Arrested Officer Race:**
Non-Black
**Rank:**
Officer/Deputy/Trooper

# Arrested Officer's Employer:

**Employing Agency:**
Phoenix Police Department
**Agency ID:**
13934890
**City:**
Phoenix
**County:**
Maricopa County
**State:**
AZ
**Type of Agency:**
Municipal Police Department

# Case Information:

**Date of Arrest:**
6/27/2015
**Most Serious Offense Charged:**
Other sex crime
**Type of Crime:**
Sex-Related Violence-Related
**Officer's Duty Status During Crime:**
On Duty

**Officer's Capacity During Crime:**
Crime was committed by officer in their official capacity
**Arresting Agency:**
Arresting agency is not officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer resigned from employment
**Criminal Case Disposition:**
Officer was convicted of crime
**Pre Trial Release:**
Officer was held in custody pending trial or disposition
**Conviction Level:**
Officer was convicted of a misdemeanor
**Conviction Type:**
Officer was convicted by a jury trial
**Most Serious Sentence:**
Officer was sentenced to jail
**Incarceration Length:**
6 months
**Appellate Review:**
Conviction was not appealed

# Victim Information:

**Victim Sex:**
F
**Victim Age:**
23
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
No
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is a stranger
**Victim Injury:**
No Physical Injuries

# Arrested Officer Information:

**Arrested Officer:**

11315N09420

**Age:**

47

**Years of Service:**

1

**Sex:**

M

**Arrested Officer Ethnicity:**

Non-Hispanic

**Arrested Officer Race:**

Non-Black

**Rank:**

Officer/Deputy/Trooper

# Arrested Officer's Employer:

**Employing Agency:**

Phoenix Police Department

**Agency ID:**

13934890

**City:**

Phoenix

**County:**

Maricopa County

**State:**

AZ

**Type of Agency:**

Municipal Police Department

# Case Information:

**Date of Arrest:**

11/8/2015

**Most Serious Offense Charged:**

Online solicitation of a child

**Type of Crime:**

Sex-Related Violence-Related Profit-Motivated

**Officer's Duty Status During Crime:**

Off Duty

**Officer's Capacity During Crime:**
This crime was committed by officer in their individual capacity
**Arresting Agency:**
Arresting agency is not officer's employer

# Case Status:

**Adverse Employment Outcome:**
Officer was suspended for a period of time
Officer's employment was terminated
**Criminal Case Disposition:**
Officer was convicted of crime
**Pre Trial Release:**
Officer was held in custody pending trial or disposition
**Conviction Level:**
Officer was convicted of a misdemeanor
**Conviction Type:**
Officer was convicted by a guilty plea
**Most Serious Sentence:**
Officer was sentenced to probation
**Appellate Review:**
Conviction was not appealed

# Victim Information:

**Victim Sex:**
F
**Victim Age:**
Unknown
**Victim Ethnicity:**
Unknown
**Victim Race:**
Unknown
**Victim is Sex Worker:**
No
**Victim is Police Officer:**
No
**Victim Relationship:**
Victim is an unrelated child
**Victim Injury:**
No Physical Injuries

David W. Dow (#007377)
Jennifer L. Ghidotti (#033071)
**DOW LAW OFFICE**
3104 E. Camelback #281
Phoenix, Arizona 85016
Phone: 480.776.5039
Fax: 480.945.0553
Email: Ddowlaw1@gmail.com
      Jlevine@ddowlaw.com
*Attorneys for Plaintiff*

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

| | |
|---|---|
| LISA GUTIERREZ,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF PHOENIX, a municipality and jural entity; SEAN PENA, an individual acting under the color of law; JOHN DOES I-V, an individual(s), acting under the color of law, and JANE DOESI-V, an individual(s), acting under the color of law; XYZ CORPORATIONS; ABC LLCs<br><br>        Defendants. | Case No. **CV2021-009877**<br><br>**PLAINTIFF'S DEMAND FOR JURY TRIAL** |

     Plaintiff, by and through undersigned counsel, hereby demands a jury trial on all triable issues.

     RESPECTFULLY SUBMITTED this 18th day of June, 2021.

            **DOW LAW OFFICE**

            By: **/s/ David Dow**

1

David W. Dow
3104 E. Camelback Road, Suite 281
Phoenix, AZ 85016
*Attorney for Plaintiff*

Person/Attorney Filing: David W Dow
Mailing Address: 3104 E Camelback Rd. #281
City, State, Zip Code: Phoenix, AZ 85016
Phone Number: (480)776-5039
E-Mail Address: ddowlaw1@gmail.com
[ ☐ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 007377, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

Lisa Gutierrez
Plaintiff(s),
v.
City of Phoenix, et al.
Defendant(s).

Case No. **CV2021-009877**

**CERTIFICATE OF
COMPULSORY ARBITRATION**

I certify that I am aware of the dollar limits and any other limitations set forth by the
Local Rules of Practice for the Maricopa County Superior Court, and I further certify that
this case IS NOT subject to compulsory arbitration, as provided by Rules 72 through 77 of
the Arizona Rules of Civil Procedure.


RESPECTFULLY SUBMITTED this


By: David W Dow /s/
      Plaintiff/Attorney for Plaintiff

AZturboCourt.gov Form Set #5815917